**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **SHARON CASTRILLON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **CAUSE NO. 1:11-cv-430-WTL-DML** |
| | ) |
| **ST. VINCENT HOSPITAL AND HEALTH** | ) |
| **CARE CENTER, INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the motion for summary judgment filed by Defendant St. Vincent Hospital and Health Care Center, Inc., ("St. Vincent") (found at Dkt. Nos. 197 and 207), the motion for partial summary judgment filed by Defendants Steven Gerke and Maria Espinoza (Dkt. No. 199), and two motions for leave to file surreplies filed by Plaintiff Sharon Castrillon (Dtk. Nos. 246 and 251). The motions are fully briefed and the Court, being duly advised, rules as follows.

## I.  FACTUAL BACKGROUND

The facts of record, viewed in the light most favorable to the Plaintiff, as the non-moving party, are as follow.

Dr. Castrillon began working as a first-year resident in the Internal Medicine Residency Program at St. Vincent on July 1, 2008. Defendant Gerke, as the Assistant Director of the Internal Medicine Residency Program and the Medical Director of St. Vincent's Internal Medical Clinic, was one of Dr. Castrillon's supervisors. Dr. Gerke found Dr. Castrillon attractive when he interviewed her for the residency position and first told her of his attraction when he went to her house in June 2008, before she began working at St. Vincent.

In July 2008, St. Vincent determined that Dr. Castrillon and another first year resident needed to repeat their cardiology rotation due to a lack of medical knowledge and unsuccessful overall performance.  Dr. Castrillon successfully repeated that rotation.

In August 2008, Dr. Castrillon participated in an international rotation that Dr. Gerke supervised.  During the trip, Dr. Gerke became upset when she talked to another man, chased her through the hotel, and banged on the door of her room while yelling for her; her roommate answered the door and told him she was not available to speak to him.

From September 2008 to December 2008 or January 2009, Dr. Gerke and Dr. Castrillon had a sexual relationship.  At the time, Dr. Gerke also was dating Defendant Maria Espinoza (now Gerke; for the sake of clarity she will be referred to as "Maria" in this Entry), who worked at St. Vincent as an interpreter in the internal medicine clinic.  On more than one occasion, Dr. Castrillon attempted to end her relationship with Dr. Gerke; in fact, Dr. Gerke contacted her sister twice asking for her help in wooing Dr. Castrillon back, telling her, for example, that he loved Dr. Castrillon "more than she knows . . . I want very much for all of her dreams to come true, and I feel TRULY and UNCONTROLLABLY, compelled to try and make them come true myself.  But the situation is very complicated, and I just want to do what is right for everyone." In December 2008 or January 2009, Dr. Castrillon ended her intimate relationship with Dr. Gerke for good and asked him to stop calling her, sending her love letters, and contacting her family.  She then worked to avoid him by, for example, completing her patient notes at home rather than at the hospital.  For a period of time she tried to block his calls, but realized that was infeasible because, as her supervisor, he had to be able to reach her for work purposes.  Dr. Gerke sent her approximately three love letters after she ended the relationship; she received the last one in "maybe July 2009."

In October 2008, Dr. Castrillon met twice with Dr. Craig Wilson, who was the director of St. Vincent's internal medicine residency program, about an issue with her punctuality. Dr. Castrillon reported that she was having some health issues (a neck fracture) that had caused her tardiness. Dr. Wilson believed that to be a successful intervention with Dr. Castrillon.

On January 23, 2009, Dr. Castrillon was placed on a remediation plan because she scored below the 10th percentile on a national exam (the "ITE exam") which put her in the category of academically at-risk. Dr. Castrillon believes she was at a disadvantage in taking this exam because, unlike other residents, she was not given time off from her rotations to take it, but rather was required to take it at home while she was working the night shift of the emergency medicine rotation.

In an evaluation dated February 24, 2009, Dr. Stephen Knaus noted that he was "troubled by some professionalism concerns, including repeated tardiness and poor follow-up on some patient care issues." Dr. Castrillon does not believe she was tardy during her rotation with Dr. Knaus except for once when she drove into a snowbank.

In March 2009, Dr. Gerke reported, in writing, to Dr. Wilson, who was his supervisor, that Dr. Castrillon had "been persistently negligent in completing her clinic notes on time for several months." In his letter, Dr. Gerke noted that he had addressed the issue of incomplete clinic notes with Dr. Castrillon twice by e-mail (once in November 2008 and again in February 2009) and admitted in his letter to Dr. Wilson that he "may have complicated the problem by not calling for discipline before now." He stated that he was "[r]eluctantly . . . forced to conclude that [Dr. Castrillon] is not willing to make a professional commitment to [her patients'] care, or her own education." He recommended that she be removed from service until her notes were completed, that she be required to complete all of her notes by 7:00 a.m. on the day following

each office visit, and that she be placed on academic probation if she were unable to comply with those terms. Dr. Gerke's policy as expressed to Dr. Castrillon had been that clinic notes were considered complete as long as the relevant information was entered, even if the note was left "open" in the system to permit further editing. After Dr. Castrillon ended their relationship, Dr. Gerke began defining any note left open after 48 hours as untimely, even if the relevant information had been entered.

Dr. Wilson met with Dr. Gerke to discuss Dr. Castrillon on March 16, 2009. That same day, Dr. Wilson placed Dr. Castrillon on academic probation, noting "a persistent trend of tardiness" and "a persistent habit of not completing [her] outpatient notes in a timely manner." The letter informing Dr. Castrillon of the terms of her probation provided that her promotion to second-year residency status ("PGY-2") would be "contingent upon successful remediation of the above concerns." At that time, Dr. Castrillon had been tardy only twice during her residency; once in September when she overslept due to pain medication she was taking for a neck fracture, and again in January when her car slid into a snowbank. She had addressed those incidents with her relevant supervisors when they occurred and believed the issues had been resolved.

During her period of probation, Dr. Castrillon was not informed of any further issues with tardiness or the timeliness of her clinic notes.

On March 21, 2009, five days after putting Dr. Castrillon on probation, Dr. Wilson stated in an email to his supervisor, Dr. Robert Lubitz, St. Vincent's Vice President of Academic Affairs and Research, that he needed to discuss with him a "sensitive issue" regarding Dr. Gerke and Dr. Castrillon and that he might not renew Dr. Castrillon's contract. He similarly emailed Dr. Lannie Caition, another administrator in the residency program, about a "messy situation"

involving Drs. Castrillon and Gerke. Dr. Wilson testified at his deposition that the "messy situation" referred to the fact that he had received an unusual phone call from Maria Espinoza reporting to him that she had overheard Dr. Castrillon call Dr. Gerke an asshole during an argument.

On March 25, 2009, Dr. Wilson notified Dr. Gerke that his employment contract would not be renewed. This followed an incident in which Dr. Gerke berated St. Vincent information technology staff regarding a computer issue. The nonrenewal letter from St. Vincent states that "despite multiple attempts at counseling, you [Dr. Gerke] are failing to uphold our core value of reverence by continuing to demonstrate behaviors that are inconsistent with the above requests [to 'represent our Department calmly and professionally,' to 'not bypass the established chains of command when attempting to resolve conflict,' and to 'allow me to review external communications prior to their release by you']." The meeting notes produced by St. Vincent reflect that the specific concerns relating to Dr. Gerke's nonrenewal included "[c]oncerns raised by residents regarding temper and overaggressive attempts to discipline residents – verbally demeaning to residents who have not completed administrative tasks, sometimes without confirming beforehand whether the accusations are accurate." Dr. Gerke testified that this characterization of his performance was not accurate. Despite the issues identified as supporting the decision not to renew Dr. Gerke's contract, Dr. Lubitz recommended him for another position within the St. Vincent network and Dr. Wilson, on his own initiative, wrote a positive recommendation letter for Dr. Gerke to assist him in finding another position. Dr. Gerke continued to work at the hospital until June 23, 2009.

In her April 22, 2009, evaluation of Dr. Castrillon, Dr. Larissa Day expressed concerns with her professionalism as it related to "complete, timely changeover," which refers to the

briefing regarding the status of patients that occurs at a shift change. Dr. Wilson had previously been made aware of complaints by other residents regarding Dr. Castrillon's failure to complete timely changeovers in September 2008.

By letter dated June 30, 2009, signed by Dr. Wilson, St. Vincent promoted Dr. Castrillon to her second year of residency, which began the following day. Dr. Wilson testified that this promotion occurred because he signed a form letter accidentally. On July 8, 2009, Dr. Castrillon and Kyle Defur, president of St. Vincent, signed her new contract and her promotion to PGY-2 was processed by the hospital.

Meanwhile, on July 3, 2009, Maria Espinoza learned of Dr. Gerke's affair with Dr. Castrillon when he left a letter he had written to her on his printer. Maria, who describes herself as being "hurt, distraught, [an] emotional wreck" at that time, began a campaign of revenge against Dr. Castrillon that lasted for more than a year. Maria sent Dr. Castrillon numerous admittedly "hateful" letters, some of which appeared to be from Dr. Gerke and others of which appeared to be from a fellow resident. Maria mailed some of the letters and put others in Dr. Castrillon's work mailbox. Maria also sent an anonymous letter to Dr. Wilson and Dr. Victor Collier asserting that Dr. Castrillon used marijuana and planned to seduce St. Vincent male faculty members. Dr. Gerke participated in sending the letter to Dr. Collier; after Maria saw Dr. Castrillon and Dr. Collier "near him a couple of times . . . really close," he and Maria believed he needed to be warned so he "wouldn't also get caught up in any kind of mess like we were in with her . . . [h]aving an affair with somebody at work and having to work with them still." Maria Gerke Dep. at 49, 55. Maria also posted negative comments about and ratings of Dr. Castrillon on professional ratings websites, posing as patients she had treated.

On July 16, 2009, Dr. Wilson emailed Dr. Lubitz and Joyce Dobson, St. Vincent's Manager of Medical Education and Chair of St. Vincent's Gradual Medical Education Committee ("GMEC"), about the anonymous letter he received (that he referred to as "an accusation from one of her resident peers") that alleged that Dr. Castrillon used recreational drugs and planned to seduce male members of the St. Vincent faculty, including Dr. Wilson himself. He had already spoken to Kim Sykes-Joseph from the St. Vincent Human Resources Department about the anonymous accusations. His email read, in part:

> Kim confirmed that a peer's accusation is insufficient to warrant a formal fitness for duty evaluation. I have provided her with a copy of our impairment policy. My opinion is that [Dr. Castrillon's] continued tardiness and delayed note completion represent impaired behavior by our residency standards as highlighted in our policy. Because of the nature of the allegations, and due to the fact that [Dr. Castrillon] is already on academic probation with repeated offenses, I would like to refer the case to both of you as representatives of the Graduate Medical Education committee, and would value the opportunity to discuss our options for remediation (or otherwise) with you and our HR representative. There is email documentation of inappropriate correspondence with faculty, the late attendance, as well as . . . documentation of note completion delays.

No investigation was conducted by Dr. Wilson or anyone else at St. Vincent regarding the anonymous letter or the accusations made therein.

By letter dated July 23, 2009, Dr. Wilson terminated Dr. Castrillon's employment. The letter noted that at the time she was placed on probation Dr. Castrillon had "provided assurance" that an "evaluation for medical and/or psychologic [sic] contributors to [her] impaired performance" was not necessary. It then identified two "substantial concerns" that remained regarding Dr. Castrillon's performance:

> Patient Care
> You continue to demonstrate noncompliance with program policy regarding completion of medical records. A review of your clinic note completion in Allscripts demonstrates charts from 7/2/09 that were not completed until 7/13/09 and notes from 7/9/09 that were not complete as of review on 7/15/09. Three of four notes from your 7/16/09 clinic remain incomplete as of 7/23/09.

> Professionalism
> Despite repeated verbal and written reprimands you have again demonstrated late
> attendance (90 minutes) for weekend rounding responsibilities on June 6th 2009.

The letter then informed Dr. Castrillon that based on these "ongoing policy infractions while on probationary status," her employment with St. Vincent was terminated.

Shortly after she returned from her termination meeting with Dr. Wilson, Dr. Castrillon received a phone call from Maria, during which Maria said something along the lines of "Karma's a bitch, isn't it?  Go back to the swamp, you dirty whore."[1]

Dr. Castrillon appealed her termination.  In her letter initiating the appeal, she expressed surprise at her termination for several reasons.  First, she believed her probation period ended with her promotion to PGY-2 as of July 1, 2009.  Second, she denied being tardy on June 6, 2009, and asked that the allegation of tardiness be checked with the relevant attending staff physician, Dr. Napoleon Maminta.[2]  She also pointed out that she was promoted to PGY-2 after the date she was allegedly late and the tardiness incident had not been addressed with her prior to her termination.  Finally, with regard to the late clinic notes referenced in the letter, she explained that they were the result of technical difficulties caused by St. Vincent's implementation of a new computer program.  She explained that she had sought help from the information technology department and attended training in order to adapt to the new system.

---

[1] In their reply brief, the Gerkes assert that the record is undisputed that this call occurred after Dr. Castrillon's second termination.  In fact, both Dr. Castrillon and Maria testified that Maria called Dr. Castrillon after each of her terminations, and Maria herself describes the content of the first of these calls as quoted.  Maria Gerke Dep. at 70, 98.

[2] When asked the following week, Dr. Maminta responded that "I do remember something about this issue but it seemed minor.  I did not arrive to round until 10 or 11 am that day so do not recall any significant issues."  In fact, the supervising resident who told Dr. Wilson that Dr. Castrillon was late (as part of a general assessment of her performance) was not there the day in question, as it was her day off.

She also stated that the residents were told that the "policy for note completion this month was also held less stringent, as told to us with the installment of the [new computer program]."

Dr. Castrillon contacted Karen Iseminger, Ph.D., St. Vincent's ethicist, to serve as her ombudsman during the appeal process. Pursuant to St. Vincent's Staff Handbook, Dr. Iseminger is available to serve "as a confidant or an interpreter of delicate or controversial situations." Dr. Castrillon and a friend, Dr. Joseph Zalocha, had a phone conversation with Dr. Iseminger in which they discussed Dr. Castrillon's relationship with Dr. Gerke, his behavior when she ended the relationship, and her belief that her rejection of Dr. Gerke had played a role in her probation and termination. Dr. Iseminger advised Dr. Castrillon to "forget about all that" and focus on the reasons given for her termination.

The GMEC met and considered Dr. Castrillon's appeal on August 7, 2009. The committee's vote resulted in a tie. The tie ultimately was resolved by Dr. Lubitz, who voted in favor of reinstating Dr. Castrillon. Prior to Dr. Lubitz's decision, he and Dr. Iseminger exchanged emails in which Dr. Iseminger asked to meet with him privately to discuss "a related issue."

By letter dated August 17, 2009, Dr. Lubitz informed Dr. Castrillon of her reinstatement. The letter stated the following: "Reinstatement is conditional on acceptance of the terms of training to be outlined by the Internal Medicine Residency Program: note that you are being reinstated into a PGY-1 probationary status." On the same date, Dr. Wilson sent Dr. Castrillon a letter setting forth the following terms of her reinstatement: (1) completing "the standard rehiring process"; (2) undergoing an independent evaluation of her medical/psychological health and an evaluation for psychological impairments (including learning impediments); (3) repeating ten months of the PGY-1 program (all core rotations except cardiology); and (4) maintaining

compliance with "the stipulations outlined in the program's probation letter regarding professionalism and patient care" and maintaining "professional conduct through all forms of communication—in person, in writing, etc. to patients, faculty, and peers." The letter further noted that Dr. Lorrie Miller-Rice would be her faculty advisor and she was required to meet with her at least monthly. Finally, the letter noted the following:

> There will be "zero tolerance" for violation of the above stipulations, meaning that any breach of the requirements set forth in this letter will be grounds for immediate termination without recourse. The designation of any such deviation as a "breach" will be adjudicated by the Internal Medicine Program Director, Associate Program Directors, Chief Residents, Manager of Graduate Medical Education, and Designated Institutional Official. It is your responsibility to fully understand and accept responsibility for compliance with program expectations and policies, hospital policies, and medical education department policies, for punctuality, and for execution of all resident responsibilities.

The terms set forth in the letter were arrived at by Dr. Wilson and Dr. Lubitz, with input from Joyce Dobson; the full GMEC did not review them, although many of them were discussed by the GMEC.

Dr. Castrillon agreed to the conditions and resumed her employment with St. Vincent. On the day she returned to work, she was required to take the ITE exam. Her exam was scored as if she were a PGY-2 resident, even though she had been reinstated as a PGY-1 resident.

At some point between June and September 2009, Dr. Castrillon called St. Vincent's Department of Human Resources and complained that Dr. Gerke was sending her love letters and that Maria was harassing her by leaving anonymous letters in her mailbox and calling her. She does not recall the exact date she called and does not know with whom she spoke. She received no follow-up from St. Vincent regarding this complaint.

In September 2009, Dr. Gerke sent an anonymous letter about Dr. Castrillon to St. Vincent's Director of Human Resources. The letter alleged that Dr. Castrillon used marijuana,

was in the habit of hacking into the hospital's computer system, and was very vindictive and "known for fabricating falsehoods, particularly against male associates."

Dr. Castrillon continued to receive vulgar and derogatory letters that appeared to be from Dr. Gerke, but which were authored by Maria. Dr. Gerke also received numerous vulgar and derogatory letters that appeared to be from Dr. Castrillon, but also were authored by Maria.

On February 15, 2010, Dr. Robert Love reported to Dr. Wilson and others that he and Dr. Mike Hornbecker had met with Dr. Castrillon to discuss "failed expectations regarding changeovers and tardiness." Dr. Love concluded that "even after all that has occurred in the past year, [Dr. Castrillon's] own perception differs from the perception of others." Dr. Castrillon explained at her deposition that she had completed the changeover in question, but that she had not used a Sharepoint document to do so; Dr. Hornbecker's expectation was that changeovers would be done via a Sharepoint document, while Dr. Castrillon believed an alternative method was acceptable.

On February 19, 2010, Dr. Wilson met with the residency leadership team regarding whether Dr. Castrillon's contract should be renewed. The group unanimously decided that it should not be, subject to approval of the decision by Dr. Robert Love and Joyce Dobson. Apparently in response to the specific performance deficiencies discussed at the team meeting,[3] Dr. Love remarked in an email to Dr. Wilson:

> I feel hesitant to focus on anything that is not strictly true or is not unique to [Dr. Castrillon], when itemizing [Dr. Castrillon's] deficiencies. I just don't want to have to defend something that feels petty or questionable.
> · She did present her PEBL to my team in 11/09. I think she might have held on to the written document to finish up some details and then never turned it in, but she claims to have turned it in to me and I can't confidently deny it.
> · She does know what the green pager is but just didn't know the pager number. That she would need help in understanding how to deal with the

---

[3]Dr. Castrillon cites to the minutes from that meeting but the Court is unable to locate them in the record.

SBP question demonstrates poor competency but it is not accurate that she didn't know what the pager is.
- Her ITE score is very discouraging but specifically is not permitted to play into her promotion decision.

The problem is that each of the individual components in our database related to [Dr. Castrillon's] competency is relatively minor and a little embarrassing to bring up but, taken together and in the context of a remediation program, paint a convincing picture of multi-competency failure. I think we should do what we can to emphasize the latter and minimize emphasis on individual stumbles. Each stumble is small and would usually be overlooked as a transient aberrancy except for the big picture reality that they are persistent in spite of her situation.

With regard to one incident that apparently was considered in making the decision, further investigation revealed that Dr. Castrillon had incorrectly been named as the doctor who failed to properly "change over" a patient at shift change.

By letter dated February 25, 2010, Dr. Wilson notified Dr. Castrillon that her employment contract with St. Vincent would not be renewed because of "pan-competency deficiency." The letter stated: "It is the consensus of the program leadership that you are failing to make suitable remedial progress in terms of your performance in all ACGME core competencies. It is our belief that you are unlikely to demonstrate satisfactory progress in order for you to matriculate to the PGY-2 level as of July 2010."

On March 3, 2010, Dobson spoke with Dr. Castrillon about reports that she had made negative statements about St. Vincent and her employment situation. Dr. Castrillon was not told of the details of the alleged negative statements. The meeting was precipitated by Dr. Wilson's report to Dobson that another resident had told Dr. Wilson about a conversation at a nurse's station during which Dr. Castrillon had discussed her frustration about her contract non-renewal. The resident reported that Dr. Castrillon had told her that "everything that was said about her (as far as reasons for her non-renewal) was a lie and the program 'has a personal vendetta' against her. She mention[ed] that she [felt] this is all related to some sexual harassment by a faculty

member last year and that the program just wants her to go away so the issue will go away. She then mentioned that her father has hired a lawyer to look into filing a lawsuit." Dobson provided Dr. Castrillon a letter that admonished her to avoid discussing her academic difficulties publicly and reiterated St. Vincent's "core value of integrity." Dr. Castrillon was instructed to sign the letter to indicate "that you have read and understand this letter." After taking the letter home to review it, Dr. Castrillon refused to sign it because the accusation contained therein was false. Instead, she wrote a letter to Dobson that stated "I hope this serves as an affirmation of receipt of the attached content, however, my disagreement to these accusations I hope has remained quite obvious."

On March 17, 2010, St. Vincent terminated Dr. Castrillon's employment, effective the following day. The Disciplinary Action Form memorializing the decision notes that the terms of Dr. Castrillon's reinstatement after her appeal had included a "zero-tolerance policy against future breaches of professionalism." It then noted that after being notified of the non-renewal of her contract,

> Dr. Castrillon advised faculty members of her intent to pursue legal action against the program. One conversation is known to have occurred in a public arena. Dr. Castrillon was notified by Joyce Dobson, Manager of Medical Education, that such behavior should cease immediately. Dr. Castrillon denied having engaged in such behavior, despite documentation to the contrary. In addition, Dr. Castrillon acknowledged but refused to sign a written request from the Department of Medical Education to avoid negative statements in public venues against the program and its leadership. In view of the zero tolerance policy of non-professionalism, Dr. Castrillon's position with St. Vincent hospital is being termed [sic] effective March 18, 2010.

Within an hour of being notified of her termination, Dr. Castrillon received another phone call from Maria, this time imitating Donald Trump's catch phrase from his television show *The Apprentice*: "You're fired!" Dr. Castrillon called St. Vincent's Human Resources Department to complain about Maria's harassment; St. Vincent did not follow up on her

complaint. When Dr. Castrillon attempted to appeal her termination, she was told by Dr. Lubitz that the appeal was late because it was not filed within five days of her termination and because she was not entitled to appeal in any event. Dr. Castrillon believes that Dobson told her she had five business days to appeal; Dr. Lubitz took the position that she had only five calendar days.

Dr. Castrillon filed a charge of discrimination with the EEOC on May 5, 2010.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## III. DISCUSSION

Dr. Castrillon's Complaint asserts fifteen counts. As relevant to the instant motions, Counts I through IV assert claims against St. Vincent for various violations of Title VII. Count V asserts that St. Vincent breached its employment contract with Dr. Castrillon; Count VI asserts

that St. Vincent breached its contract with the Accreditation Council for Graduate Medical Education ("ACGME") and that Dr. Castrillon is a third-party beneficiary to that contract. Count VIII asserts a claim against St. Vincent for breach of the implied covenant of good faith and fair dealing. Count IX asserts a claim against St. Vincent for negligent retention of Dr. Gerke and Maria Espinoza; and Count X is a fraud claim against St. Vincent. St. Vincent moves for summary judgment on all of these claims. Dr. Gerke and Maria seek summary judgment on Count XIV, which asserts that they tortiously interfered with Dr. Castrillon's employment contract with St. Vincent.

Before the Court addresses the parties' arguments regarding the various claims at issue, the Court notes that Dr. Castrillon sought leave to file surreplies in opposition to both motions for summary judgment. Those motions for leave are granted. In making the instant rulings, the Court has considered the surreplies as well as the arguments made by the parties in briefing the motions for leave. One of those arguments involves the expert witness report and supplemental affidavit submitted by Dr. Castrillon in opposition to the summary judgment motions. The Court did not need to, and therefore did not, consider the proffered expert report and affidavit in resolving the instant motions. The issue of whether the expert witness should be permitted to testify at trial is one that merits more thorough briefing than that presented by the parties thus far.

### A. Count I: Title VII Retaliation

Title VII prohibits employers from retaliating against employees for their opposition to unlawful employment practices. 42 U.S.C. § 2000e-3(a). Dr. Castrillon proceeds under the so-called "direct method" of avoiding summary judgment, "which requires her to provide evidence that (1) she engaged in a statutorily protected activity, (2) her employer took a materially adverse

action against her, and (3) there was a causal connection between the two." *Malin v. Hospira,*

*Inc.*, ___ F.3d ____. 2014 WL 3896175 (7th Cir. 2014).

With regard to the first requirement, in its opening brief, St. Vincent states that it

concedes for purposes of its motion that Dr. Castrillon engaged in protected activity and suffered

a materially adverse action. It then identifies several instances of protected activity—(1) Dr.

Castrillon's complaint to Karen Iseminger during the appeal of her first termination; (2) the

phone call to human resources at some point between June and September 2009; and (3) her

comments to her fellow resident at the nurse's station—and argues that there is no evidence of

any causal connection between those actions and any adverse employment action.

In her response, Dr. Castrillon identifies something else altogether as the protected

activity that led to retaliation: her opposition to Dr. Gerke's romantic and sexual advances.[4]

Specifically, she argues that she was placed on probation on March 16, 2009, as a result of Dr.

Gerke's complaints about her performance and that Dr. Gerke made those complaints because

she ended their relationship and refused his continued pressure to renew it.[5] *See* Castrillon Brief

---

[4]The Court rejects Dr. Castrillon's suggestion that because St. Vincent conceded in its opening brief that she engaged in *some forms of* protected activity it was foreclosed from addressing the viability of other alleged forms of protected activity in its reply brief.

[5]As Dr. Castrillon notes in her surreply, the Seventh Circuit has declined to weigh in on the circuit split that exists surrounding the issue of "whether a person who rejects a supervisor's sexual advances has engaged in protected activity." *Tate v. Executive Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008) (*comparing LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 389 (5th Cir.2007) (holding that a single, express rejection of sexual advances does not constitute "protected activity" for purposes of a retaliation claim) *with Ogden v. Wax Works*, Inc., 214 F.3d 999, 1007 (8th Cir. 2000) (finding that when the plaintiff told her supervisor to stop harassing her, she engaged in the most "basic form of protected conduct")). In this case, Dr. Castrillon testified that Dr. Gerke pursued her and that she felt pressured to engage in a sexual relationship with him because of his position at St. Vincent and what might happen to her if she rejected him; she also testified that she believed it was improper for a resident and an attending physician to have a romantic relationship. She further testified that she repeatedly asked Dr. Gerke to stop contacting her for non-work reasons and that she actively avoided such contact with him. The Court finds that under the circumstances of this case—and, again, viewing the facts in the light

at 23 ("On March 16, 2009, Dr. Gerke caused Dr. Wilson to place Dr. Castrillon on probation in retaliation for her direct opposition to his unwanted romantic and sexual harassment.").[6] Dr. Castrillon further asserts that all of the subsequent adverse actions taken against her stemmed from that probation. St. Vincent does not address either of these arguments in its reply brief. Because the evidence of record, viewed in the light most favorable to Dr. Castrillon, would support a finding that Dr. Gerke made his complaint to Dr. Wilson because Dr. Castrillon refused his advances, and because St. Vincent has not made any arguments regarding any other aspect of this theory of liability, St. Vincent has not demonstrated that it is entitled to summary judgment on this claim.

### B. Count II: Sexual Harassment

In Count II of her complaint, Dr. Castrillon alleges that Dr. Gerke and Maria sexually harassed her because of her gender. St. Vincent advances two reasons why it is entitled to summary judgment on this claim.

First, St. Vincent alleges that Maria's harassment of Dr. Castrillon was not because of her gender, but rather a personal vendetta against Dr. Castrillon because of Dr. Castrillon's relationship with Dr. Gerke. It is true that workplace harassment, no matter how egregious, is not actionable under Title VII unless it is motivated by gender (or another protected

---

most favorable to Dr. Castrillon—a reasonable jury could find that Dr. Castrillon's ending of the relationship and continued rejection of Dr. Gerke's advances constituted protected activity.

[6]While Dr. Castrillon does not refer to it by name, this argument implicates a form of the so-called "cat's paw theory." *See, e.g.*, *Matthews v. Waukesha County*, 759 F.3d 821, 829 (7th Cir. 2014) ("In the law of employment discrimination, the 'cat's paw' theory can apply when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action. Liability under that theory can be imposed where a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action." (citations and internal quotation marks omitted)).

characteristic) rather than personal animosity. *See, e.g.*, *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) ("Title VII protects against discrimination, not 'personal animosity or juvenile behavior.'") (quoting *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 666 (7th Cir.2005)).  In this case, as St. Vincent points out, Maria testified that she harassed Dr. Castrillon because she wanted to make her feel bad "just like she made [Maria] feel bad." However, Maria also testified that she felt compelled to send letters warning male members of St. Vincent's administration that Dr. Castrillon was a seductress who was planning to use sex to advance (or perhaps save) her career at the hospital.  A jury reasonably could find based on that testimony that at least some of Maria's actions were based on Dr. Castrillon's gender, specifically on Maria's perception that Dr. Castrillon, as a woman, was likely to cause problems for her male supervisors.[7]

St. Vincent also argues that Dr. Castrillon's claims based on sexual harassment by Dr. Gerke are time-barred because it is undisputed that Dr. Castrillon did not file her EEOC complaint until more than 300 days after Dr. Gerke's last day of employment at St. Vincent.  In response, Dr. Castrillon argues that the continuing violation doctrine preserves her claim because Dr. Gerke and Maria's campaign of harassment against her was continued by Maria after Dr. Gerke left St. Vincent's employ.  "[W]hen an assertedly unlawful employment practice occurs as a pattern over time rather than in one discrete act, it does not matter when the individual deeds contributing to the pattern occurred, if the pattern continued into the 300 days before the charge's filing."  *King v. Acosta Sales and Marketing, Inc.*, 678 F.3d 470, 472 (7th Cir. 2012) (citing

---

[7]St. Vincent argues in its reply brief that "Plaintiff submits no evidence, whatsoever, that St. Vincent knew of Ms. Espinoza's behavior toward Plaintiff."  St. Vincent Reply at 7.  St. Vincent did not raise this issue in its opening brief with regard to this claim; accordingly, Dr. Castrillon had no reason to address it in her response.

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, (2002)).  The Court agrees that while the jury certainly could agree with St. Vincent's characterization of the evidence, a reasonable jury could instead find that Dr. Gerke and Maria together engaged in a pattern of harassment against Dr. Castrillon that began with Dr. Gerke's March 16, 2009, complaint to Dr. Wilson, continued with Maria's March 2009 phone call to Dr. Wilson, and was continued by Maria well into the 300-day period.[8]  Accordingly, the Court cannot find as a matter of law that Dr. Castrillon's sexual harassment claim against Dr. Gerke is time barred.

### C.  Count III:  Retaliatory Harassment

In Count III, Dr. Castrillon alleges that Maria harassed her in retaliation for reporting Dr. Gerke's harassment.  The Court agrees with St. Vincent that Dr. Castrillon has pointed to no evidence in the record to support this allegation, an argument Dr. Castrillon does not address in her response.  Accordingly, summary judgment is granted in favor of St. Vincent on Count III.

### D.  Count V:  Breach of Contract

Dr. Castrillon argues that St. Vincent's refusal to consider her appeal of her March 2010 termination constituted a breach of its employment contract with her.  As St. Vincent points out, even if Dr. Castrillon was denied the right to appeal in breach of the contract, her claim fails as a matter of law because she has failed to produce any evidence that she suffered damages as a result of the breach.  "The essential elements of a breach of contract claim are the existence of a contract, the defendant's breach thereof, and damages."  *Auto-Owners Ins. Co. v. C & J Real*

---

[8]To be clear, actions taken by *Dr. Gerke* after he was no longer a St. Vincent employee cannot form the basis of a sexual harassment claim against St. Vincent; there is simply no way St. Vincent can be liable for actions taken by someone not in its employ.  Therefore the fact that Dr. Gerke made phone calls to Dr. Castrillon after he left St. Vincent (even if there were evidence in the record regarding the content of those phone calls which, curiously, there does not appear to be) is irrelevant to Dr. Castrillon's sexual harassment claim.

*Estate, Inc.*, 996 N.E.2d 803, 805 (Ind. Ct. App. 2013). In order to demonstrate that she suffered damages as a result of the alleged breach in this case, Dr. Castrillon would have to show by a preponderance of the evidence that had she been permitted to appeal her termination that appeal would have led to her reinstatement. Dr. Castrillon fails even to address this argument in her response brief. In her surreply, Dr. Castrillon argues that St. Vincent is nonetheless not entitled to summary judgment because "St. Vincent must prove there is no genuine dispute of material fact on that issue. Fed. R. Civ. P. 56(a), (c)(1). It has not done so, and the Court may not grant summary judgment on the basis of this element, even if it concludes that Dr. Castrillon designated no evidence at all." Castrillon Surreply at 10 (citing *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996) ("Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial.")).

Dr. Castrillon overstates St. Vincent's burden. St. Vincent does not have to prove anything to obtain summary judgment on this issue; rather, Dr. Castrillon has the burden of proving each element of her breach of contract claim. St. Vincent articulated, with appropriate legal citation, a specific reason why that claim fails as a matter of law: Dr. Castrillon has no evidence that she was damaged by the alleged breach. St. Vincent did not need to designate any evidence to support the assertion that the record lacks evidence on this point. Dr. Castrillon, however, did have to respond to St. Vincent's argument by pointing to evidence from which a reasonable jury could find in her favor. *See, e.g.*, *Goodman v. National Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) ("We often call summary judgment the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on

which a reasonable jury could rely." (citations omitted)) (*quoted in Chaib v. Indiana*, 744 F.3d 974, 984 (7th Cir. 2014)).  She failed to do so.  Indeed, she failed even to acknowledge St. Vincent's argument until her surreply, and therefore forfeited the opportunity to respond to it. *See, e.g., Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[A]n argument raised for the first time in a reply brief is forfeited.").  Accordingly, St. Vincent's motion for summary judgment is granted as to Count V.

### E.  Count VI:  Third Party Beneficiary Claim

Dr. Castrillon alleges as to Count VI that "[a]s part of the accreditation agreement between St. Vincent and the ACGME, St. Vincent is required to adhere to the ACGME's Institutional Requirements."  She alleges that her treatment by St. Vincent violated those Institutional Requirements in several respects.  Accordingly, she argues that "St. Vincent also breached its contractual obligations to Dr. Castrillon as a third party beneficiary to St. Vincent's accreditation by the ACGME" and therefore she "should be allowed to recover against St. Vincent under that contract."

The problem with this argument is that Dr. Castrillon has not identified any contract between St. Vincent and the ACGME.  Rather, it has identified standards that ACGME has established for all of its accredited institutions.  These are akin to regulations established by an administrative body, rather than a contract governing a relationship between two entities.  If St. Vincent fails to substantially comply with ACGME's requirements, ACGME can revoke its accreditation; that would not be a "breach" of any "contract" by St. Vincent, but rather a decision by ACGME, as a regulatory institution, that St. Vincent is no longer entitled to accreditation.  In other words, Dr. Castrillon has produced nothing that demonstrates that St. Vincent promised ACGME that it would follow its requirements.  Rather, it has produced a set of regulations that

ACGME requires St. Vincent to follow *if St. Vincent wishes to retain accreditation. Cf. Chicago School of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schools &Colleges*, 44 F.3d 447, 449 (7th Cir. 1994) ("[A]ccrediting bodies are not engaged in commercial transactions for which state-law contract principles are natural matches. The 'contract' the School wants to enforce is not a bargained-for exchange but a set of rules developed by an entity with many of the attributes of an administrative agency.").

Because Dr. Castrillon has not demonstrated the existence of an enforceable contract between ACGME and St. Vincent, it is axiomatic that she has not demonstrated that she was the third party beneficiary of any such contract. Accordingly, St. Vincent's motion for summary judgment is granted as to Count VI.

### F. Count VIII: Breach of Duty of Good Faith and Fair Dealing

In Count VIII, Dr. Castrillon alleges that St. Vincent breached its implied duty of good faith and fair dealing by "refusing to provide adequate academic and professional guidance, and by implementing obstacles for the purpose of causing Dr. Castrillon to fail, including, but not limited to, scheduling Dr. Castrillon's work and exams to ensure that Dr. Castrillon would not have any opportunity to study or prepare, and by providing notice of the non-renewal of her employment contract after the final registration deadline to enter the [national resident matching program to obtain a position with another hospital]." Complaint at ¶ 110. "Indiana courts have recognized an implied covenant of good faith and fair dealing in contract law, but generally only in limited circumstances involving employment contracts and insurance contracts." *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 123 (Ind. App. 2008). St. Vincent argues that Dr. Castrillon's claim fails because she should not be viewed as an employee of St. Vincent, but rather as a student in St. Vincent's residency program. However, as St. Vincent concedes, a

medical resident is both an employee and a student. St. Vincent goes too far, then, when it implies that a medical resident can never assert a claim for breach of good faith and fair dealing against the hospital in which she works. Therefore, St. Vincent's motion for summary judgment on this issue, as it now stands, is denied.

That said, the Court frankly is skeptical that St. Vincent, *as Dr. Castrillon's employer*, had a duty to aid in Dr. Castrillon's academic and professional development, which is what she alleges. St. Vincent alludes to this issue in its reply brief, but fails to place it in the proper legal framework. Dr. Castrillon, for her part, has not done an adequate job of articulating the law that applies to her claim and identifying the contours of the duty she alleges was breached by St. Vincent as her employer. Because this appears to be a question of law to be resolved by the Court, pursuant to Federal Rule of Civil Procedure 56(f), the Court directs the parties to brief this issue as set forth at the conclusion of this Entry.

### G. Count IX: Negligent Retention

Dr. Castrillon alleges that St. Vincent is liable to her for negligent retention in three respects: (1) it retained Dr. Gerke after an allegation of sexual harassment was made against him in 2005; (2) it retained Dr. Gerke in a position of authority over Dr. Castrillon from March 25, 2009, to June 23, 2009, even after learning of the "messy situation" involving the two of them; and (3) it retained Maria as an employee even after learning of her harassment of Dr. Castrillon. With regard to the first allegation, St. Vincent asserts that the 2005 complaint against Dr. Gerke was "not substantiated in any way" and therefore it did not constitute a "history of harassment" by Dr. Gerke that should have led St. Vincent to take action. The Court agrees with St. Vincent that Dr. Castrillon points to no evidence in the record from which a reasonable jury could

determine that St. Vincent acted negligently with regard to the 2005 allegation.[9] To find otherwise would essentially require a finding that an employer is negligent any time it fails to terminate an employee against whom a harassment allegation is made.

With regard to the other two allegations, St. Vincent argues only that there is no evidence in the record that St. Vincent knew or should have known of Dr. Gerke's or Maria's actions. The Court disagrees. Drawing all reasonable inferences in favor of Dr. Castrillon, the jury could find that Dr. Wilson knew that Dr. Gerke had been romantically involved with Dr. Castrillon and, despite his testimony to the contrary, he was referring to that fact when he sent emails about a "messy situation" involving the two of them. The jury also reasonably could find that St. Vincent knew or should have known of Maria's harassment of Dr. Castrillon. For example, Dr. Castrillon testified that she called human resources to report the harassment in 2009,[10] and Dr. Wilson acknowledged that he thought at the time that the anonymous letter he received could have been written by Maria; the jury could infer from this that Dr. Wilson at least should have known about the affair and subsequent harassment but chose to turn a blind eye. Accordingly, St. Vincent's motion for summary judgment on Count IX must be denied.

### H. Count X: Fraud

In Count X, Dr. Castrillon alleges that "St. Vincent falsely represented to Dr. Castrillon that the [GMEC] had voted to reinstate Dr. Castrillon only if she agreed to certain onerous employment terms and conditions identified in Dr. Wilson's August 17, 2009 letter to Dr.

---

[9]Once again, Dr. Castrillon's suggestion that St. Vincent was required to disprove her claim in order to obtain summary judgment is incorrect.
[10]St. Vincent characterizes this testimony as an "epiphany during her deposition" and notes its vagueness as to both the date and the content of the call. St. Vincent certainly may argue to the jury that her testimony is not worthy of belief for these reasons. The Court cannot make credibility determinations when ruling on summary judgment, however.

Castrillon." The record demonstrates that, in fact, Dr. Castrillon was informed by Dr. Lubitz in a letter dated August 17, 2009, that the GMEC had voted to reinstate her "conditional on acceptance of the terms of training to be outlined by the Internal Medicine Residency Program." As promised by Dr. Lubitz, Dr. Wilson's letter of the same date set forth the conditions of her reinstatement. There is simply no evidence that either letter contained any statement that was untrue. Dr. Castrillon essentially argues that St. Vincent has not proven that the GMEC left the determination of the appropriate conditions of reinstatement up to the Internal Medicine Residency Program, but that is not St. Vincent's burden. Rather, it is Dr. Castrillon's burden to prove that the statements made in the letters were false. She has not done so. Accordingly, St. Vincent's motion for summary judgment is granted as to Count X.

## I. Count XIV: Tortious Interference

Dr. Gerke and Maria (hereinafter referred to collectively as "the Gerkes") move for summary judgment on only one of the claims against them: Count XIV of Dr. Castrillon's complaint, in which she alleges that they tortiously interfered with her employment contract by causing St. Vincent to terminate her employment. The Gerkes' sole argument in their motion was that "[f]or the reasons set forth in Defendant St. Vincent's Motion for Summary Judgment and supporting materials, even assuming that Castrillon is able to establish the remaining elements of her claim, . . . Castrillon has not established that the Gerkes' actions caused St. Vincent to breach its contract with Castrillon." Gerke Brief at 2. Thus, the Gerkes simply argued that if the Court granted summary judgment in favor of St. Vincent on the breach of contract claim against it, they would be entitled to summary judgment on the tortious interference claim against them because one of the elements of that claim is that the contract in question was breached.

Contrary to Dr. Castrillon's assertion, there was nothing improper about the procedure used by the Gerkes. It would have been redundant for them to cite to evidence in support of their limited argument, which was a purely legal issue that was wholly dependent upon the success of St. Vincent's argument and the evidence St. Vincent already had cited.

Other than their procedural argument, Dr. Castrillon's entire substantive response to the Gerkes' motion is as follows:

> Moreover, the record shows that the Gerkes' misconduct actually caused St. Vincent to breach its employment contract with Dr. Castrillon. As discussed in Section III.B.1.a., supra, Dr. Gerke wrongfully caused St. Vincent to place Dr. Castrillon on probation on March 16, 2009 without adhering to the progressive disciplinary policies set forth in its own Handbook; moreover, the details he provided Dr. Wilson about the 'sensitive' and 'messy' situation between he and Dr. Castrillon nearly caused Dr. Wilson to terminate her employment then. (DOE 53; DOE 53). Likewise, as discussed in Section III.B.1.b., supra, Ms. Gerke's anonymous letters prompted St. Vincent to terminate Dr. Castrillon's employment, less than a month after her promotion, on a pretextual basis, without adhering to the progressive discipline policies in its own Handbook. E.g., (DOE 64) (asking "[a]re there two paths to get to the same place [termination] after learning that nothing can be done to Dr. Castrillon on the basis of Maria Gerke's anonymous letters"). And although Dr. Wilson's initial decision to terminate Dr. Castrillon's employment was reversed on appeal, he crafted a set of onerous reinstatement terms which were designed to drive Dr. Castrillon from the Program. (DOE 14 at 13.) Because the Gerkes caused St. Vincent to wrongfully terminate Dr. Castrillon's employment, in violation of Title VII, the Court should deny summary judgment on Count XIV of Dr. Castrillon's Complaint.

Castrillon Response at 48-49. The Court does not disagree with Dr. Castrillon that the jury reasonably could find that one or both of the Gerkes "caused St. Vincent to wrongfully terminate Dr. Castrillon's employment, in violation of Title VII." The problem is that Count XIV of Dr. Castrillon's complaint cannot reasonably be read to make that allegation. Instead, Count XIV unequivocally asserts a claim for tortious interference with Dr. Castrillon's employment contract with St. Vincent. Dr. Castrillon has failed to articulate how St. Vincent's actions constituted a breach of her employment contract. Perhaps they did, but it is not the Court's job to match the

facts of record with the elements of the cause of action Dr. Castrillon chose to plead. Dr. Castrillon had the opportunity to do so and did not take it; accordingly, the Gerkes are entitled to summary judgment on Count XIV.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Dr. Castrillon's motions (Dkt. Nos. 246 and 251) to file surreplies are **GRANTED**. **The Clerk is directed to file the surreplies, found at Dkt. Nos. 246-1 and 251-1, as of the date of this Entry.** St. Vincent's motion for summary judgment, found at Dkt. Nos. 197 and 207, is **GRANTED IN PART AND DENIED IN PART**; it is granted as to Counts III, V, VI, and X and denied in all other respects. The motion for partial summary judgment filed by Dr. Gerke and Maria Espinoza as to Count XIV (Dkt. No. 199) is **GRANTED**.

With regard to Count VIII of Dr. Castrillon's Complaint, the parties are directed to brief the legal issue of what specific duty under Indiana law St. Vincent had to Dr. Castrillon as her employer that she believes St. Vincent breached by acting in bad faith. Dr. Castrillon has already set forth how she believes St. Vincent acted in bad faith and has supported her allegations with evidence of record; the precise issue that remains to be addressed is what duty Dr. Castrillon believes was breached and whether Indiana imposes such a duty on employers. Because it is Dr. Castrillon's burden to articulate how she believes the facts of record satisfy each element of her breach of the duty of good faith and fair dealing claim, Dr. Castrillon shall file the first brief, which shall be limited to ten pages and which shall be filed **within 14 days of the date of this Entry**. St. Vincent shall then respond **within 14 days of Dr. Castrillon's filing**; that brief shall be limited to ten pages as well. No reply shall be filed without invitation from the Court.

SO ORDERED:  9/29/14


_William T Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification