UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SHARON CASTRILLON, | ) |
| | ) |
|   Plaintiff, | ) |
| | ) |
|     vs. | ) CAUSE NO. 1:11-cv-430-WTL-DML |
| | ) |
| ST. VINCENT HOSPITAL AND HEALTH | ) |
| CARE CENTER, INC., et al., | ) |
| | ) |
|   Defendants. | ) |

## ENTRY REGARDING MOTIONS TO EXCLUDE EXPERT TESTIMONY

This cause is before the Court on several motions filed by the Defendants seeking to exclude portions of the expected testimony of the Plaintiff's expert witnesses. In addition, the Plaintiff has filed a motion to file a surreply relating to one of the motions; that motion (Dkt. No. 406) is **GRANTED** and the Clerk is directed to file Docket No. 406-1. The Court, being duly advised, resolves each motion as follows.[1]

### I. STANDARD

The admissibility of expert testimony "is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771-72 (7th Cir. 2014).

> Rule 702(c) requires that an expert's testimony be "the product of reliable principles and methods." Similarly, Rule 703 requires the expert to rely on "facts or data," as opposed to subjective impressions. *Daubert* laid out four factors by which courts can evaluate the reliability of expert testimony: (1) whether the expert's conclusions are falsifiable; (2) whether the expert's method has been subject to peer review; (3) whether there is a known error rate associated with the

---

[1] For the benefit of the docket clerk, in addition to Dkt. No. 406, this Entry resolves Dkt. Nos. 303, 314, 339, and 353.

>technique; and (4) whether the method is generally accepted in the relevant scientific community. 509 U.S. at 593–94, 113 S.Ct. 2786.

*Id.* The Supreme Court in *Daubert* interpreted Rule 702 to require that district courts, prior to admitting expert testimony, determine whether the testimony is reliable and whether it will assist the trier of fact in determining some fact that is at issue. That is, the district court serves as a "gatekeeper" whose role is to ensure that an expert's testimony is reliable and relevant." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) (internal citations omitted).

## II. DISCUSSION

The Plaintiff has named four expert witnesses; the Defendants move to exclude all or part of the testimony of each of them.

### A. Stan Smith (Dkt. No. 303)

St. Vincent moves to exclude the testimony of the Plaintiff's expert Stan Smith, Ph.D., who is an economist. Dr. Smith opines both to the Plaintiff's wage loss and the value of her loss of enjoyment of life. St. Vincent argues that both of his opinions are faulty and should be excluded. The Court agrees.

First, Dr. Smith assigns a dollar value to the Plaintiff's loss of enjoyment of life, or hedonic damages, from the date of the events at issue in this case through her expected life expectancy of 81.9 years. Dr. Smith's methodology involves establishing an estimated "value of life" based upon various studies that measure the value of life using the "willingness-to-pay" method. As Dr. Smith explains, "[t]he studies examine incremental pay for risky occupations as well as a multitude of data regarding expenditure for life savings by individuals, industry, and state and federal agencies." Dr. Smith then asked the Plaintiff to estimate by what percentage her enjoyment of her life was decreased in the past and will be decreased in the future as a result

of the incidents at issue in this lawsuit. Finally, Dr. Smith applied those percentages to the baseline "value of life" number to arrive at the value of the reduction in the value of the Plaintiff's enjoyment of life caused by the relevant events.

Dr. Smith has been permitted to testify in numerous state and federal cases; however, his methodology also has been rejected by numerous courts for a variety of reasons. *See, e.g.*, *Smith v. Jenkins*, 732 F.3d 51, 66 (1st Cir. 2013) (citing cases and noting that "[t]he overwhelming majority of courts have concluded that his 'willingness-to-pay' methodology is either unreliable or not likely to assist the jury in valuing hedonic damages, or both"); *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992) (expressing "serious doubts about his assertion that the studies he relies upon actually measure how much Americans value life"). The Court concurs with the analyses of Dr. Smith's methodology in *Smith* and *Mercado* and finds particularly problematic one aspect of his methodology. As the First Circuit notes, Dr. Smith's methodology equates the "value of life" that the studies he relies on purport to quantify with the "value of enjoyment of life" that he has been asked to calculate in this case. Even assuming Dr. Smith arrives at his "value of life" number in a scientifically reliable way, reducing it by, say, 25 percent would arrive at the value of a life that has been cut short by 25 percent, not at a life that is of the same duration but 25 percent *less enjoyable*. In order to be useful to the jury, Dr. Smith would have had to start with the value of the *enjoyment* of the Plaintiff's life but-for the events at issue in this case and then reduce *that figure* by the percentage of enjoyment she has lost; instead, he started with what he purports to the overall value of her life.[2] Dr. Smith offers no explanation why he believes the value of a person's life is the same as the value of the enjoyment of a person's life,

---

[2]This is evident from the fact that the studies he relies on involved calculating the amount individuals, industry, and governmental agencies spent to *save lives*, not simply to protect the enjoyment of life.

and, as the First Circuit held, "[t]hat Dr. Smith may equate [the two] is not enough to bridge that gap." *Id.* at 67.[3]  Accordingly, Dr. Smith's testimony regarding hedonic damages lacks a factual basis and therefore fails to satisfy Rule 702 and will not be admitted.

Dr. Smith also offers a calculation of the Plaintiff's lost wages, which he arrives at by calculating the value of the salary (including benefits) the Plaintiff would have earned for the remainder of her residency, then during a critical care fellowship, and finally as a practicing critical care specialist during the course of her life and comparing it to the value of the average annual earnings for white, non-Hispanic females age 35-44 with a bachelor's degree for that same time period.  St. Vincent argues that his calculations are based on two faulty factual premises.

First, St. Vincent takes issue with Dr. Smith's opinion assumption that the Plaintiff would have become a critical care specialist, in light of the fact that she was in an internal medicine residency program and, it argues, it is mere speculation that she would have been accepted to and completed a critical care fellowship following her residency.  "Damages must be proved, and not just dreamed, though some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer."  *MindGames, Inc. v. Western Pub. Co., Inc.*, 218 F.3d 652, 658 (7th Cir. 2000).  The Plaintiff has the burden of

---

[3]The Plaintiff cites to an article by prominent economists Eric Posner and Cass Sunstein for the proposition that "hedonic damages are widely accepted within the community of economists today." Dkt. No. 375 at 5 (citing Eric A. Posner & Cass R. Sunstein, *Dollars and Death*, 72 U. Chi. L. Rev. 534 (2005)).  As the article's title suggests, it deals with assigning value for the loss of life, not the loss of enjoyment of life by someone who is still living.  The case relied upon by the Plaintiff, *Sherrod v. Berry*, 827 F.2d 195 (7th Cir. 1987), also dealt with a death, and in any event does not appear to involve the methodology used in this case.  Finally, the fact that this Court denied a motion to exclude Dr. Smith's testimony in another case does not help the Plaintiff; the plaintiff in that case benefited from the narrow arguments made by the defendant in that case, while the Defendants in this case have made arguments that have led the Court to conduct a broader review of the issue.

proving her damages to a reasonable degree of certainty, *Pearson v. Welborn*, 471 F.3d 732, 744 (7th Cir. 2006), and the Court agrees with St. Vincent that the Plaintiff's own testimony that she intended to apply for a critical care fellowship after completing her residency is not, without more, enough in this case. The Court has, and the jury will have, no idea what percentage of residents who apply for a critical care fellowship are accepted, what qualifications successful applicants have, and whether the Plaintiff was likely to have those qualifications. Absent this type of evidence, the jury will have no way of knowing whether the Plaintiff's hope to become a critical care specialist was reasonably certain to be realized or more likely a pipe dream. Accordingly, unless the Plaintiff lays a properly supported foundation at trial, Dr. Smith's testimony on lost earnings will not be admissible because there will be no evidentiary basis for his assumption that the Plaintiff would have had a career in critical care medicine rather than internal medicine.[4]

St. Vincent also argues that it was improper for Dr. Smith to offset the Plaintiff's lost future earnings with the average annual earnings for white, non-Hispanic females age 35-44 with a bachelor's degree because this ignores the fact that she has a medical degree, not just a bachelor's degree, and also ignores the fact that she is currently working as the president of a freight company and earning substantially more than the average salary he used.[5] Again, the Court agrees with St. Vincent; Dr. Smith's assumption that the Plaintiff's current earning

---

[4]The Plaintiff's argument that St. Vincent has failed to present any evidence that demonstrates that "critical care fellowships are particularly competitive or rigorous . . . and no basis to conclude that Dr. Castrillon would not have been successful in gaining entry or completing the fellowship" ignores the fact that it is the Plaintiff's burden to lay the necessary evidentiary foundation for her expert's opinions, not the Defendants' burden to refute it.

[5]It is unclear why the Plaintiff refers to this demonstrable fact—that the Plaintiff is currently capable of making $100,000—as the "lay opinion" of St. Vincent.

capacity is $62,904 is demonstrably incorrect if, in fact, she is earning $100,000 in her current position.

## B.  Sharon Lawrence (contained within Dkt. No. 305)[6]

Sharon Lawrence is the Plaintiff's expert on human resources.  St. Vincent does not dispute her qualifications in that area:  "To be clear, St. Vincent concedes that Lawrence can testify that, in her opinion, Gerke's termination was against industry standards . . . [and] that if Castrillon properly reported allegations of sexual harassment, then St. Vincent would have been required, consistent with industry standards, to address those allegations."  Dkt. No. 306 at 16.  However, St. Vincent seeks to preclude Lawrence from testifying that in her opinion St. Vincent's stated reason for terminated Dr. Gerke is untrue.  *See* Lawrence Report at 9 ("[T]he circumstances in this case leading to the termination of Dr. Gerke cannot be accepted on face value of the reasons offered by St. Vincent Hospital, Dr. Wilson and Dr. Lubitz.  In my opinion, there are other reasons that led to the termination of Dr. Gerke's employment that have not been disclosed by the previously noted parties.").  The Court agrees that this portion of Lawrence's report goes a step too far, venturing out of expert territory and improperly drawing inferences regarding the credibility of other witnesses.  While the Plaintiff argues that "Ms. Lawrence is not attempting to offer opinions about the true motivations of St. Vincent . . .; she is merely offering opinions as to whether such actions by the Defendants are consistent with St. Vincent's own

---

[6]Rather than filing a separate *Daubert* motion, St. Vincent included in its motions in limine a motion to exclude portions of expert Sharon Lawrence's testimony.  While the Plaintiff argues to the contrary, there was nothing improper about this given that the deadline for both types of motion was the same; the Court suspects St. Vincent took that approach because its arguments regarding Ms. Lawrence were relatively brief and perhaps did not merit an entire brief.  If the Plaintiff wished to take two weeks to respond to that portion of the motion in limine on the ground that she would have had two weeks to respond to a separate *Daubert* motion, as opposed to the one week deadline for responding to motions in limine, she could have so moved.

policies or industry best practices, and whether St. Vincent's actions are consistent with ordinary practices, based on her experience and training," the portion of her report quoted above—which is the precise portion of her report and anticipated testimony to which St. Vincent objects—cannot be characterized in any way other than "offer[ing] opinions about the true motivations of St. Vincent."

Lawrence may opine whether, in her opinion, Dr. Gerke's termination was inconsistent with industry standards; as St. Vincent concedes, that is proper expert testimony because Lawrence has knowledge of those industry standards that the jury does not. However, Lawrence may not testify that the fact that Dr. Gerke's termination was inconsistent with industry standards leads her to conclude that St. Vincent's proffered reasons for that termination are false. That is an inference that the jury will or will not draw based on all of the relevant evidence—including their determination about the credibility of St. Vincent's witnesses' testimony. Lawrence's expertise in the area of human resources does not qualify her to suggest to the jury what inferences it should draw. *Cf. U.S. v. Santos*, 201 F.3d 953, 962-63 (7th Cir. 2000) (court erroneously allowed witnesses to "step[] outside the boundaries of their personal knowledge and invade[] the province of the jury" by testifying that they believed manager issued a particular order based upon their general experience with the manager); *U.S. v. Vest*, 116 F.3d 1179, 1185 (7th Cir. 1997) ("'Credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's "stamp of approval" on a particular witness' testimony may unduly influence the jury.'") (quoting *U.S. v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)).

St. Vincent also argues that Lawrence should not be permitted to testify that St. Vincent ombudsman Karen Iseminger had a duty to report any complaint of sexual harassment she

received from the Plaintiff. It appears that Lawrence conceded in her deposition that she does not, in fact, know whether Dr. Iseminger had such an obligation under St. Vincent's policy; the Court assumes that she will not testify otherwise at trial and is confident that if she does that inconsistent testimony will be impeached.

### C. David Hartman (Dkt. No. 314)

In their Motion to Exclude Select Testimony of David E. Hartman, Ph.D., the Gerkes seek to exclude three specific aspects of the expected testimony of Dr. Hartman, who is a licensed psychologist. First, the Gerkes object to the statement in Dr. Hartman's report that he concurs with an opinion contained in the expert report of another of Plaintiff's experts, Dr. Mathew, regarding the propriety of Dr. Gerke's actions vis-à-vis the Plaintiff given their relative positions at St. Vincent. The Court agrees that this opinion is outside of Dr. Hartman's area of expertise and it is not appropriate for an expert in one field to vouch for the opinion of an expert in another field. Dr. Hartman may opine regarding the psychological impact that Dr. Gerke had on the Plaintiff, but he may not put his stamp of approval on Dr. Mathew's testimony in the process.

Next, the Gerkes object to Dr. Hartman's opinion that based on the evidence he had been provided, Dr. Gerke's behavior was "characteristic of stalking." The impropriety of this testimony is obvious. It will be up to the jury to consider all of the evidence at trial—much of which Dr. Hartman was not privy to when he formed his "stalking" opinion—and conclude which of the alleged events occurred and which did not. Even assuming that the jury concludes that all of the events alleged by the Plaintiff did, in fact, occur, it is simply irrelevant to any issue in this case that Dr. Hartman believes Dr. Gerke's behavior was "characteristic of stalking." The jury will not be asked to determine whether Dr. Gerke "stalked" the Plaintiff; rather, the jury will

be asked to determine what Dr. Gerke did and apply the legal standards of sexual harassment under Title VII, intentional infliction of emotional distress, trespass, and defamation to determine whether what he did satisfies the elements of any or all of those claims.[7] Labeling Dr. Gerke a "stalker" would serve no purpose other than to prejudice the jury against Dr. Gerke.[8] Testimony on this topic is therefore excluded pursuant to Federal Rule of Evidence 403; the Plaintiff should not elicit such testimony and should instruct Dr. Hartman not to use the term "stalker" or any similar term in his testimony, and if the Plaintiff wishes to make an offer to prove on this subject she shall do so outside of the presence of the jury.

Finally, the Gerkes object to any testimony from Dr. Hartman regarding the Plaintiff's mental state prior to the time he examined her. The Court does not read Dr. Hartman's testimony as suggesting that he knows what the Plaintiff's mental state was, which would be improper speculation; rather, he simply explains that her current state mental state is not necessarily indicative of her past mental state and then makes the rather unremarkable observation that someone like the Plaintiff who was terminated from her residency program and lost her father almost certainly experienced some degree of emotional distress. There is nothing improper about this testimony.

---

[7] The Plaintiff argues that whether Dr. Gerke's behavior is characteristic of a stalker is relevant to her negligent retention claim. It is not. Whether St. Vincent negligently retained Dr. Gerke will depend on what Dr. Gerke's behavior was and to what extent (and at what point) St. Vincent was or should have been aware of that behavior. The fact that Dr. Hartman views all of his alleged behavior—at least some of which occurred after he was no longer employed by St. Vincent—as "characteristic of stalking" is not relevant to the jury's consideration of that claim.

[8] Indeed, even if such a label were relevant, there does not appear to be any basis for Dr. Hartman giving such an opinion as an expert. If by "stalking" he was referring to some sort of psychological diagnosis, which would be within his expertise, he conceded in his deposition that he cannot make such a diagnosis, having never met Dr. Gerke. If he was using the term in a more colloquial sense, he is no more qualified than the jury to consider the evidence (indeed less qualified, since he is only privy to part of the evidence) and determine whether Dr. Gerke's behavior constituted "stalking" in the common sense of the word.

**D.  Suja Mathew, M.D.**

St. Vincent and the Gerkes filed separate motions to exclude portions of Dr. Suja Mathew's expert testimony on May 5, 2015.  As an initial matter, the Plaintiff argues that the motions were untimely.  The Plaintiff is correct.   The deadline for *Daubert* motions in this case originally was sixty days prior to trial.  In an entry dated March 4, 2015, Magistrate Judge Lynch determined that no viable deadline for completing expert depositions had been established and set a deadline of April 15, 2015.  In light of the fact that that deadline was after the deadline for *Daubert* motions, she set a new deadline of April 24, 2015, for those motions. By entry dated April 15, 2015, Magistrate Judge Lynch granted relief from those deadlines with regard to Dr. Mathew due to difficulties in scheduling her deposition.  With regard to Dr. Mathew, *Daubert* motions were to be filed by May 1, 2015, with responses due May 8, 2015.

The Defendants assert that Magistrate Judge Lynch "[c]learly . . . intended the motion regarding Suja Mathew, M.D. to be filed to coincide with the responsive pleadings associated with the pre-trial motions that were due on April 24, 2015."  This is far from clear; what is clear is that she established a May 1st deadline.  The Defendants believe that the May 1st deadline became May 5th when the Court extended the deadline for the responsive pre-trial filings to May 5th.  It did not.  The Court's order specifically referred to filing deadlines established pursuant to Part VIII of the case management plan.  *Daubert* motions are not addressed in Part VIII of the case management plan—they are addressed in Part III—and in any event the final deadlines for *Daubert* motions in this case were established by Magistrate Judge Lynch's order, not by the case management plan.

So the *Daubert* motions regarding Dr. Mathew were filed four days late.  The Court takes defense counsel at their word that they believed the deadline had been moved along with the

10

other deadlines. The Court finds that their explanation satisfies the excusable neglect standard under Rule 6(b)(1)(B) which

> is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include the danger of prejudice to the [opposing party], the length of the delay and its potential impact on judicial proceedings, the reasons for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Raymond v. Ameritech Corp.*, 442 F.3d 600, 606 (7th Cir. 2006) (quoting *Pioneer Investment Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993)). The delay was short and given the host of other issues the Court had to address in this case during the same time period did not significantly impact the Court's ability to address the issues in the motions. The Plaintiff argues that her time to respond to the motion was shortened from seven days to three, but the Plaintiff has filed a robust response and a surreply, which the Court has considered; in addition, she would have had good cause to seek an extension of her deadline if she needed it. Accordingly, the Court will consider the untimely motions.

### *1. St. Vincent's Motion (Dkt. No. 339)*

Dr. Mathew is the Plaintiff's expert on the topic of graduate medical education programs. St. Vincent does not challenge her qualifications as an expert in that area generally, but moves to exclude several of the opinions contained in her expert report.

First, St. Vincent objects to Dr. Mathew's testimony that she believes that "Dr. Wilson appeared to have knowledge of (or at least indications of) Dr. Gerke's inappropriate relationship with Dr. Castrillon." Mathew Report at 8. The Court agrees that this testimony is improper. It is for the jury to consider the relevant evidence (including weighing the credibility of Dr. Wilson) and determine whether it believes Dr. Wilson or finds Dr. Wilson's testimony on the issue not credible in light of the evidence pointed to by Dr. Mathew (or other evidence). As

11

discussed above in the context of Sharon Lawrence's testimony, an expert may not tell the jury whom to believe or what inferences it should draw from the evidence. Dr. Mathew may, however, testify as to what Dr. Wilson should have done—or how what he did was improper—pursuant to the relevant industry standard, *assuming* that Dr. Wilson knew about the relationship between Dr. Gerke and the Plaintiff, leaving it up to the jury to determine whether that assumption is correct.

Next, St. Vincent objects to Dr. Mathew's opinion that St. Vincent's decision to put the Plaintiff on probation was based on Dr. Gerke's evaluations. That, too, is a factual issue for the jury to resolve after weighing the relevant evidence. The same is true with regard to Dr. Mathew's testimony that St. Vincent took certain actions in order to punish the Plaintiff.[9] Dr. Mathew is no more qualified than the jury to examine the evidence and determine what motivated St. Vincent's decisions and actions. She may not tell the jury how to do its job. Similarly, Dr. Mathew may not testify that she does not believe St. Vincent's explanation that it sent the Plaintiff a promotion letter by mistake; this, too, is an inference that the jury must decide whether to draw.[10] Dr. Mathew has no specialized knowledge that would assist the jury in doing so; the fact that such a mistake would be "rare" in her experience is irrelevant, as she has no

---

[9]Dr. Mathew may testify regarding whether it would be reasonable within the industry or under St. Vincent's own policies to require someone with the Plaintiff's performance record to repeat the first year of her residency, as that is something that is within her expertise and will assist the jury's understanding. An average juror will not know whether one unsatisfactory rating, unanimous unsatisfactory ratings, or something in between typically is required before a resident is required to repeat a rotation or an entire year.

[10]Dr. Mathew of course may testify about the ACGME requirement of 120 days advance notice and any other industry standards or St. Vincent policies that are relevant to deciding not to promote a resident or not to renew a resident's contract, and may opine whether St. Vincent followed those policies and standard.

12

knowledge of whether St. Vincent is more prone to making such mistakes than the hospitals with which she has experience.

### 2. The Gerkes' Motion (Dkt. No. 353)

Like St. Vincent, the Gerkes do not challenge Dr. Mathew's qualifications as an expert in her field. However, they do object to certain opinions contained in Dr. Mathew's report and supplemental affidavit that they argue are outside of her field because they relate to the interpersonal dynamics of the relationship between Dr. Gerke and the Plaintiff. The Court agrees that Dr. Mathew is not qualified to offer an expert opinion about whether Dr. Gerke exerted psychological control over the Plaintiff; nor is she any more qualified than the jury to review the evidence and determine whether Dr. Gerke pursued, was obsessed with, or manipulated the Plaintiff. As the Gerkes concede, she may certainly testify regarding industry standards relating to relationships between residents and faculty members. The Court finds that her opinion that such relationships run the risk of "disrupt[ing] the proper decorum of the residency program, impair[ing] faculty members' ability to assess the subordinate with whom they are having a relationship, and giv[ing] rise to abusive power dynamics," Mathew Report at 7, also is within her expertise and appropriate. She may not, however, give her opinion regarding whether the evidence in this case demonstrates that Dr. Gerke was, in fact, obsessed with the Plaintiff and that his attention was unwelcome. The jury will hear the evidence, assess the witness's credibility (something that Dr. Mathew has not had the opportunity to do) and make that determination for itself.

SO ORDERED:

5/29/2015

*[signature: William T. Lawrence]*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification